943 So.2d 429 (2006)
NORTH AMERICAN TREATMENT SYSTEMS, INC.
v.
SCOTTSDALE INSURANCE COMPANY, Wright & Percy Insurance, Inc., and Montgomery & Collins, Inc. of California.
No. 2005 CA 0081.
Court of Appeal of Louisiana, First Circuit.
August 23, 2006.
Rehearing Denied October 25, 2006.
*433 Andre G. Bourgeois, Baton Rouge, Kevin J. Price, Alvin Jones, Irvine, Counsel for Plaintiff/Appellee North American Treatment Systems, Inc.
H. Alston Johnson, III, Baton Rouge, Jay Russell Sever, New Orleans, Counsel for Defendant/Appellant Scottsdale Insurance Company.
Before: CARTER, C.J., DOWNING and GAIDRY, JJ.
GAIDRY, J.
This is an appeal of a partial summary judgment relating to coverage provided under a policy of commercial general liability (CGL) insurance issued by the defendant-appellant, Scottsdale Insurance Company (Scottsdale). In connection with its appeal, Scottsdale has also filed a peremptory exception of res judicata. For the following reasons, we overrule the exception, affirm the judgment in part, reverse the judgment in part, and render partial summary judgment in favor of Scottsdale.

FACTS AND PROCEDURAL BACKGROUND
North American Treatment Systems, Inc. (NATS) was a California corporation formed for the sole purpose of serving as the "project manager" for the construction and startup of a wastewater treatment plant (the RP-4 plant) to be owned and operated in Fontana, California by the Chino Basin Municipal Water District (the District).[1] The District, a public agency, operated several wastewater treatment plants producing recycled water. In 1993, the District was exploring the possibility of using a then-novel treatment process that was less expensive and more efficient in use of available land. This "extended air" process utilizes large pieces of equipment known as BOAT clarifiers, which separate solids and other waste from water. The BOAT clarifier, as its acronym implies, is shaped like a boat. It is partially submerged in an oval oxidation channel or track, which allows wastewater to flow through the BOAT clarifier from its "stern" to its "bow." Most, if not all, of NATS's corporate officers and representatives were principals or employees of United Industries, Inc. (United), which manufactured and supplied the BOAT clarifier as a trade named, patented product.
On November 28, 1994, the District and NATS entered into a written contract entitled "Chino Basin Municipal Water District Contract Number: CCL-94-034 for Professional Services" (the Contract), under which NATS, under the designation of "Project Manager," would perform "the professional services required for the design, engineering, construction management, *434 and operations management required for the construction and operation of the treatment plant at the RP-4 plant site."
Because of the circumstances underlying the negotiation of the Contract, including NATS's professed experience and the District's lack of experience with the involved technology, NATS agreed as part of its contractual duties to guarantee that the total project cost would not exceed $32,900,000.00. It further agreed to guarantee that the system would meet certain technical specifications regarding the quality of the effluent water.[2]
The Contract contemplated three phases: (1) the Engineering and Design Phase; (2) the Construction Phase, expected to take twenty months; and (3) the Start-Up and Operations Phase, which encompassed several years of the plant's initial operations. Under the Engineering and Design Phase, the parties agreed that NATS would "sub-contract the professional services of a professional engineering corporation[,]" NBS Lowry, designated as the "engineering sub-consultant." NATS was responsible for paying NBS Lowry for its professional services out of its agreed compensation. Later, during the Start-Up and Operations Phase, NATS engaged the services of 7/H, a contract operations group certified in the specialized environmental work of operating the plant. 7/H was involved in the start-up and initial year of operation of the plant and helped to train the District's plant personnel in the process.
As the contract for the actual construction of the RP-4 plant was subject to California's public bid laws, the Contract provided that the District would contract separately with the construction contractor and be responsible for all payments to that contractor. However, NATS was responsible for developing the final bid document for the construction contract, based upon the District's standard bid document. NATS's "construction management" duties included service as overall liaison between the District and Aoki Pacific Corporation/T & K Mechanical, Inc. Joint Venture (APC/T & K), the licensed contractor eventually awarded the construction contract, and NBS Lowry, the licensed design engineer. NATS was not licensed in California as either a professional engineering corporation or a professional contractor.
On November 1, 1995, APC/T & K and the District entered into the construction contract for the RP-4 plant. Under the terms of that contract, APC/T & K agreed to "perform and complete in a workmanlike manner all work required" in the District's specifications and to "furnish at their own expense all labor, materials, equipment, tools, and services necessary" as stipulated in the specifications. Construction proceeded through 1996 and 1997, with the plant originally scheduled to be operational by mid-1997.
On June 27, 1997, during the course of APC/T & K's testing the oxidation channel for leaks, one of its subcontractors or equipment suppliers left an effluent water valve open, allowing water to improperly flow into a BOAT clarifier from its "bow" *435 to its "stern" (opposite from the intended direction of flow) while not partially submerged. The improper water flow flooded the BOAT clarifier, and the water's weight caused it to collapse and fall into the channel, thereby destroying it. The District was compensated for the associated financial loss by its property insurer, Agricultural Insurance Company (Agricultural).

The California Arbitration and Litigation
The Arbitration: On May 28, 1998, the District filed suit in the Superior Court of the State of California for the County of San Bernardino, seeking to compel arbitration with NATS under the terms of the Contract. The District alleged that a dispute had arisen "as to whether or not the RP-4 facility as constructed will comply with the performance guarantees provided for in the contract between the parties by adequately treating domestic sewage to the degree guaranteed by the criteria of the written contract," and that the parties could not agree "as to the proper testing methods" to determine whether the plant was performing as guaranteed by NATS.
Arbitration was ordered by the court, and the District specified ten issues for arbitration, none of which included or even referred to the collapse of the BOAT clarifier and its associated damages or repairs. NATS responded with its own issues for arbitration, which likewise made no direct mention of the prior collapse of the Boat clarifier.[3]
On October 1, 1998, NATS, through an attorney, wrote to Scottsdale and advised it that NATS contended that the issues in dispute involved covered claims under its policy.[4] Scottsdale did not assume NATS's defense in the arbitration.
NATS and the District compromised the claims asserted in the arbitration sometime in November 1998. Although the precise terms of the compromise are not contained in the record, the evidence indicates it did not involve any payment for property damages caused by the collapse of the BOAT clarifier.
The Agricultural Suit: On March 18, 1999, Agricultural filed suit in the Superior Court of the State of California for the County of San Bernardino against NATS, NBS Lowry, and other parties for damages based upon the collapse of the BOAT clarifier. It alleged that the collapse of the BOAT clarifier was caused by negligence on the part of the various named defendants, as well as NATS's breach of the Contract with the District, and that it was subrogated to the District's rights by virtue of its payments under its policy.
On June 11, 1999, NATS wrote to the insurance agent who procured the Scottsdale policy, stating its position that the policy provided coverage for the damages claimed by Agricultural and that Scottsdale had the duty to defend NATS in the Agricultural suit. On July 23, 1999, Scottsdale wrote to NATS, acknowledging receipt of a copy of NATS's letter to the agent. In response to NATS's request for a defense under the policy, Scottsdale stated that the policy did not provide coverage, citing its definitions of "occurrence" *436 and "property damage" and a "professional services" exclusion. It therefore refused to either defend or indemnify NATS with regard to the Agricultural suit.
On January 5, 2001, Agricultural and NATS entered into a stipulation for judgment that included the following relevant facts as the basis for a stipulated judgment:
3. WHEREAS, on or about June 26, 1997 a waste water treatment structure at [the RP-4 plant] known as a BOAT clarifier failed and collapsed, resulting in a property loss to [the District] of $847,374.80.
. . .
6. WHEREAS, Agricultural asserted that NATS was negligent and breached its contract with [the District], and that such negligence and breach of contract were legal and proximate causes of the damage to the BOAT clarifier and the losses sustained by [the District] and indemnified by Agricultural;
7. WHEREAS, the parties desire to cease incurring attorney fees and costs and based on the facts as established to date NATS hereby admits liability to plaintiff in this matter. (Emphasis supplied.)
The California court rendered judgment on the same date, approving the stipulation and entering judgment in favor of Agricultural for the stipulated monetary amount, plus prejudgment interest, attorney fees, and costs.

The Louisiana Litigation
The First Suit (# 457,946): On February 9, 1999, NATS filed suit in the 19th Judicial District Court for the Parish of East Baton Rouge against NBS Lowry, United, Scottsdale, and other parties, seeking damages and declaratory judgment. NATS alleged that NBS Lowry, United, and other parties involved in the RP-4 plant project were liable to it for its losses associated with the arbitration disputes by reason of their "negligence, fault and errors and omissions in their designs and/or plant equipment." It further alleged that Scottsdale denied coverage for those alleged losses and that it failed to defend and indemnify NATS in the arbitration.
The first suit mentioned the collapse of the BOAT clarifier in the following allegations:
12.
In June of 1997, prior to scheduled start-up of the RP-4 wastewater facility, one of the three Boats collapsed, through no fault of NATS.
13.
After the collapse, the District questioned whether the beams supporting the Boat, and the Boat itself, were properly designed for the Contract's seismic requirements.
14.
The District demanded that NATS replace all eighteen support beams and stiffen all three Boats for seismic compliance ("Seismic Retrofit").
NATS's alleged losses included "Design Change Orders" costing approximately $600,000.00, the "Seismic Retrofit" costing approximately $540,000.00, lost operational fees of over $230,000.00 due to delay in start-up, the procurement of a "class V" plant operator at a cost of over $100,000.00, and over $350,000.00 in attorney fees and expenses defending the disputes with the District. NATS further alleged that as the result of its settlement of the arbitration, it "received substantially less monies than it should have pursuant to its contract with the District." It *437 claimed that Scottsdale was liable to indemnify it for its covered losses and for damages in failing to defend it.
On April 14, 1999, NATS filed an amended petition, amending those allegations mentioning the collapse of the BOAT clarifier to read as follows:
12.
In June of 1997, prior to scheduled start-up of the RP-4 wastewater facility, several of the beams supporting one of the three Boats collapsed, causing physical damage to the Boat and other property.
13.
After the collapse, the District investigated whether the beams supporting the Boat, and the Boat itself, were properly designed for the Contract's seismic requirements. The District concluded that the beams and the Boat failed to meet compliance with the seismic specifications in the design specifications.
14.
The District demanded that NATS replace all eighteen support beams and stiffen all three Boats for seismic compliance ("Seismic Retrofit"). NATS undertook the Seismic Retrofit, including the necessary re-engineering of the replacement support beams and Boats, and the subsequent replacement of the support beams (six per Boat) and structural stiffening of the three Boat [sic]. NATS undertook the Seismic Retrofit.
Scottsdale subsequently moved for summary judgment dismissing NATS's claims against it, on the grounds that the losses asserted by NATS did not arise from an "occurrence" as defined in its policy and that those losses were excluded under the "work product" exclusions. Following the hearing on Scottsdale's motion, the trial court granted the motion by summary judgment signed on August 23, 1999, dismissing Scottsdale from the suit. That judgment was not appealed.[5]
The Second Suit (463,104): The present action was instituted by NATS on July 30, 1999, and was allotted to the same division of the trial court as the first suit. Originally named as defendants were Scottsdale, Wright & Percy Insurance, and Montgomery & Collins, Inc. of California. The latter two defendants were the insurance agencies involved in procuring the Scottsdale policy for NATS. They were subsequently voluntarily dismissed from the litigation by NATS.
NATS alleged that the claims asserted against it in the Agricultural suit were covered under Scottsdale's policy and that Scottsdale refused to defend it in that suit. It sought declaratory judgment against Scottsdale as to the coverage issue and also prayed for damages, statutory penalties, attorney fees, and costs. Scottsdale answered the suit, and on Scottsdale's motion the trial court consolidated the first suit and this action.
On October 18, 1999, Scottsdale moved for summary judgment on the grounds that its policy did not afford coverage for the loss alleged by NATS. Following the hearing, the trial court denied Scottsdale's motion. In written reasons issued on September 6, 2001, the trial court found that *438 the collapse of the BOAT clarifier was an "occurrence" under the policy, that the "work product" exclusions did not exclude coverage, and that genuine issues of material fact existed as to the type of services rendered by NATS, thus precluding summary judgment as to the applicability of the "professional services" exclusion. The trial court further found that Scottsdale had the duty to defend NATS under the allegations of the Agricultural suit.
On February 17, 2004, NATS filed a motion for summary judgment, seeking the determination of the inapplicability of the "professional services" and "impaired property" exclusions to its claim for coverage.[6] On March 2, 2004, Scottsdale filed a cross-motion for summary judgment, again asserting that the loss at issue in the Agricultural suit was not an "occurrence" under its policy, as well as the applicability of the "work product," "impaired property," and "professional services" exclusions.
The parties' opposing motions for summary judgment were heard on October 4, 2004. In its judgment signed on October 25, 2004, the trial court referred to its prior written reasons of September 6, 2001, granted NATS's motion, and denied Scottsdale's cross-motion. It articulated the elements of its ruling in favor of NATS as follows:
(i) Scottsdale owed and breached its legal "duty to defend" and "indemnify" NATS, its insured, for the "occurrence" listed in the underlying complaint;
(ii) "Exclusion J  Work Product" was inapplicable as no "work" was performed on the boat clarifier by NATS;
(iii) "Exclusion M  Damage to Impaired Property" did not apply because 1) there was actual physical damage to property, and 2) the boat clarifier was neither the "work" nor the "product" of NATS;
(iv) The designated "Professional Services  Contractor" exclusion was inapplicable because NATS contracted with the [District] to be its "Project Manager," or liaison, to facilitate and monitor the progress of the actual contractor (APC/T & K) and report back to the District; also NATS was not licensed anywhere as a "contractor" and performed no work as a "contractor" on the RP-4 Project.
On December 1, 2004, Scottsdale filed an uncontested motion to designate the partial summary judgment as final and appealable, and on the same date, the trial court certified the judgment as appealable pursuant to La. C.C.P. art. 1915(B)(1). Scottsdale was granted a suspensive appeal on the same date. Contemporaneously with the filing of its appellate brief, Scottsdale filed a peremptory exception of res judicata in this court as authorized by La. C.C.P. art. 2163.

RES JUDICATA
We initially address the merits of Scottsdale's peremptory exception of res judicata, also designated as its first "assignment of error," as its resolution might obviate consideration of the merits of its appeal on the coverage issues.
The general rule of res judicata in our state is set forth in La. R.S. 13:4231, as substantially amended in 1990:
Except as otherwise provided by law, a valid and final judgment is conclusive *439 between the same parties, except on appeal or other direct review, to the following extent:
(1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
(2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.
(3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.
Louisiana Revised Statutes 13:4232, enacted in 1990, establishes three limited exceptions to the general rule of res judicata. Only the first of these is possibly relevant to the present matter: "A judgment does not bar another action by the plaintiff . . . [w]hen exceptional circumstances justify relief from the res judicata effect of the judgment." La. R.S. 13:4232(A)(1).
The purpose of res judicata is to foster judicial efficiency and also to protect a defendant from multiple lawsuits asserted by a plaintiff. La. R.S. 13:4231, Comments  1990(a).
In Burguieres v. Pollingue, 02-1385 (La.2/25/03), 843 So.2d 1049, the supreme court reviewed the history of res judicata in Louisiana. The court noted that prior to the 1990 amendment, res judicata was much narrower in scope, being based upon the civilian doctrine rather than its common law counterpart. Id., 02-1385 at p. 7, 843 So.2d at 1053. Since the amendment, in order to determine if a judgment in a prior action precludes a second action, "the chief inquiry is whether the second action asserts a cause of action which arises out of the transaction or occurrence that was the subject matter of the first action." Id. See also La. R.S. 13:4231, Comments-1990(a). But the supreme court also emphasized that all of the following elements must be satisfied for res judicata to preclude a second action: (1) the judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation. Burguieres, 02-1385 at p. 8, 843 So.2d at 1053. See also Wooley v. State Farm Fire and Casualty Insurance Company, 04-882, p. 36 (La.1/19/05), 893 So.2d 746, 771.
Federal jurisprudence and that of many common-law states have adopted a "transactional" approach in determining the applicability of res judicata to a second action between parties to a prior action.[7] This court has expressly held that the use of a transactional analysis is similarly appropriate in applying our present doctrine of res judicata. See Billiot v. LeBeouf *440 Brothers Towing Company, 93-1697, pp. 3-5 (La.App. 1st Cir.6/24/94), 640 So.2d 826, 828-29, writ denied, 94-2367 (La.12/9/94), 647 So.2d 1108; Griffin v. BSFI Western E & P, Inc., 00-2122, p. 3 n. 2 (La.App. 1st Cir.2/15/02), 812 So.2d 726, 730 n. 2. The basic methodology of the transactional analysis has been stated as follows:
(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar [citations omitted], the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.
(2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. (Emphasis supplied.)
Restatement (2nd) of Judgments § 24 (1982).
In its legal sense, a "transaction" has been defined as "[t]he act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract," "something performed or carried out; a business agreement or exchange," or even "any activity involving two or more persons." Black's Law Dictionary 1535 (8th ed.2004). An "occurrence" is understood to be "[s]omething that happens or takes place; specif., an accident, event, or continuing condition that results in personal injury or property damage that is neither expected nor intended from the standpoint of an insured party." Id. at 1109. This definition corresponds with that of Scottsdale's policy: "`Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."
In Hy-Octane Investments, Ltd. v. G & B Oil Products, Inc., 97-28 (La.App. 3rd Cir.10/29/97), 702 So.2d 1057, the court was confronted with the meaning of "transaction or occurrence" in the context of determining an exception of lis pendens raising the issue of whether a reconventional demand was compulsory under La. C.C.P. art. 1061. The court discussed the substantial statutory revision of Louisiana doctrine of res judicata in 1990, including amendments to codal articles, and also reviewed the use of the phrase "transaction or occurrence" in the Code of Civil Procedure. It further observed that the meaning of the phrase, in terms of the subject matter of the litigation, "has been determined on a case-by-case basis." Id., 97-28 at p. 6, 702 So.2d at 1060. After reviewing dictionary and textual definitions, the court noted that the federal courts have given the phrase "a broad and liberal interpretation," generally meaning "[a]ll logically related events entitling a person to institute legal action against another." Id.
The use of the phrase "transaction or occurrence," with its disjunctive "or," also implicitly recognizes that the factual circumstances forming the subject matter from which a legal dispute arises may be due to either an obligation or relationship fashioned by the will or agreement of the parties (a transaction or contract), an unexpected or isolated event (or series of events) which creates an obligation or relationship (an occurrence such as an accident), or perhaps a combination of both.
*441 NATS contends that the "transaction or occurrence" underlying its first action was Scottsdale's initial denial of coverage and defense related to the arbitration, while the "transaction or occurrence" underlying the second action was the separate denial of coverage and defense related to the Agricultural suit. We disagree. While each denial of coverage or defense may have given rise to a separate cause of action on NATS's part as insured, our inquiry for purposes of res judicata must focus upon a broader range of related factual circumstances and relationships, as explained above. Scottsdale contends that the Contract was the common "transaction or occurrence" from which both Louisiana actions arose for purposes of res judicata. Again, we must disagree.
Certainly, NATS's Contract with the District was a "transaction," as was its policy issued by Scottsdale. Our review of the record, particularly the documents, pleadings, and other evidence relating to the arbitration, convinces us that the Contract was the "transaction" from which NATS's first suit arose. The issue of adequate performance of NATS's obligations and guarantees under the Contract was the basis for the demand for arbitration, itself based upon the same agreement's arbitration clause, and NATS's claim for coverage against Scottsdale related to the demand for arbitration. But we conclude that neither the Contract nor the related arbitration (nor, for that matter, the policy itself) constitutes the subject matter from which the present action arose.
This action arose from the "occurrence" of the collapse of the BOAT clarifier. The contractual relationship and obligations between the District and NATS do not constitute the type of "transaction or occurrence" that would entitle NATS to institute legal action against Scottsdale, nor does the mere issuance of Scottsdale's policy, without more, serve that purpose. But within the terms of the policy itself, the parties conventionally agreed as to the type of "occurrence" that would trigger Scottsdale's indemnity obligation and entitle NATS to seek enforcement of that obligation. We thus resolve this issue pragmatically, based upon the policy's own definition of "occurrence."[8] Equating the contractual dispute upon which the arbitration was based with the separate collapse of the BOAT clarifier simply would not "[conform] to the parties' expectations or business understanding or usage." See Restatement (2nd) of Judgments § 24 (1982). In summary, although we conclude the first four elements required for res judicata were satisfied, the fifth and most crucial element, identity of the underlying transaction or occurrence, was not. See Burguieres, supra.
This is a situation of "factual overlap," but the common factual links of the first Louisiana suit and the present action are not so interrelated as to warrant the conclusion that they arose from a common "transaction or occurrence." See Blanchard v. ABC Insurance Company, 38,005, pp. 9-10 (La.App. 2nd Cir.3/3/04), 867 So.2d 901, 906-7, writ denied, 04-1101 (La.9/3/04), 882 So.2d 607. The evidence indicates that the occurrence of the collapse of the BOAT clarifier was only indirectly and peripherally involved in the California arbitration (and later in the first *442 Louisiana suit), to the extent that it prompted the District to reassess the structural design aspects for purposes of meeting seismic design criteria (the "seismic retrofit" of all three BOAT clarifiers for the plant). The specified issues in the arbitration made no specific mention of the collapse of the BOAT clarifier, and the deposition evidence indicates that neither the District nor NATS considered there to be any relationship between the collapse and the disputes at issue in the arbitration. None of the damages or monetary losses allegedly sustained by NATS as the result of the arbitration disputes encompassed or included any actual property damage loss from the collapse of the Boat clarifier, even under the allegations of its amended petition in the first suit.
That the first suit and the present action would not have arisen but for the Contract between NATS and the District is not the determinative factor in determining whether they share a common genesis in the same "transaction or occurrence." Given the facts of this case, we conclude that Scottsdale "is not entitled to screen itself with a procedural windfall." See Billiot, 93-1697 at p. 6, 640 So.2d at 829.
In light of our conclusion above, it is unnecessary for us to consider NATS's alternate argument that "exceptional circumstances" justify relief from the effect of res judicata under La. R.S. 13:4232(A)(1). We now move on to the merits of the judgment.

THE MERITS OF THE APPEAL

Assignments of Error
In addition to its argument related to res judicata, Scottsdale argues that the trial court erred in the following respects:
[1.] The trial judge erred in granting a summary judgment to the plaintiff insured and denying a cross-motion for summary judgment in favor of the defendant insurer, because she failed to conclude that the conduct which is the subject matter of this second suit did not constitute an "occurrence" under the policy.
[2.] The trial judge erred in granting a summary judgment to the plaintiff insured and denying a cross-motion for summary judgment in favor of the defendant [insurer], because she failed to enforce one or more of the exclusions from coverage in the policy.

Standard of Review for Summary Judgment
This matter comes to us on appeal from a summary judgment. It is therefore subject to de novo review as to whether summary judgment was appropriate. Motorola, Inc. v. Associated Indemnity Corporation, 02-0716, p. 5 (La.App. 1st Cir.6/25/04), 878 So.2d 824, 828, writs denied, 04-2314, 04-2323, 04-2326, 04-2327 (La.11/19/04), 888 So.2d 207, 211, 212. We are authorized and, indeed, required to render a judgment "which is just, legal, and proper upon the record on appeal." La. C.C.P. art. 2164; Jackson National Life Insurance Company v. Kennedy-Fagan, 03-0054, p. 5 (La.App. 1st Cir.2/6/04), 873 So.2d 44, 48, writ denied, 04-0600 (La.4/23/04), 870 So.2d 307.

Summary Judgment
The summary judgment procedure is expressly favored in the law and is designed to secure the just, speedy, and inexpensive determination of non-domestic civil actions. La. C.C.P. art. 966(A)(2). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, admissions, and affidavits in the record show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B). A summary judgment may be *443 rendered dispositive of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though granting of the summary judgment does not dispose of the entire case. La. C.C.P. art. 966(E).
Scottsdale's policy was issued to NATS in Louisiana, and the parties concede that Louisiana law applies in its interpretation. Interpretation of an insurance contract is usually a legal question that can be properly resolved in the framework of a motion for summary judgment. Motorola, 02-0716 at p. 6, 878 So.2d at 829.

Insurance Policy Interpretation
An insurance policy is a contract between the parties and should be construed employing the general rules of interpretation of contracts. Id. Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. This is an objective inquiry; thus, "a party's declaration of will becomes an integral part of his will." La. C.C. art. 2045, Revision Comments  1984, (b). When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. The words of a contract must be given their generally prevailing meaning. La. C.C. art. 2047. Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. La. C.C. art. 2048. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050.
An insurer has the burden of proving that a loss comes within a policy exclusion. Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London, 616 So.2d 1250, 1252 (La.1993). Additionally, we are guided by the well-recognized rule that an exclusionary clause in an insurance policy must be strictly construed. Calogero v. Safeway Insurance Company of Louisiana, 99-1625, p. 6 (La.1/19/00), 753 So.2d 170, 173. However, an insurance policy, including its exclusions, should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. See Motorola, 02-0716 at p. 7, 878 So.2d at 829.

The Insurer's Duty to Defend
A liability insurer's duty to defend and the scope of its coverage are separate and distinct issues. Motorola, 02-0716 at p. 18, 878 So.2d at 836. It is likewise well-recognized that the obligation of a liability insurer to defend suits against its insured is generally broader than its obligation to provide coverage for damages claims. Steptore v. Masco Construction Company, Inc., 93-2064, p. 8 (La.8/18/94), 643 So.2d 1213, 1218. Thus, even if a plaintiff's claim against an insured probably lacks merit, the insurer must defend its insured, if the claim might conceivably fall within its coverage. The language of Scottsdale's policy accords with this general rule, as it expressly provides that Scottsdale had the "the right and duty to defend any `suit' seeking [property] damages."[9]
The issue of whether a liability insurer has the duty to defend a civil action *444 against its insured is determined by application of the "eight-corners rule," under which an insurer must look to the "four corners" of the plaintiff's petition and the "four corners" of its policy to determine whether it owes that duty. Vaughn v. Franklin, 00-0291, p. 5 (La. App. 1st Cir.3/28/01), 785 So.2d 79, 84, writ denied, 01-1551 (La.10/5/01), 798 So.2d 969. Under this analysis, the factual allegations of the plaintiff's petition must be liberally interpreted to determine whether they set forth grounds that raise even the possibility of liability under the policy. Id. In other words, the test is not whether the allegations unambiguously assert coverage, but, rather, whether they do not unambiguously exclude coverage. Vaughn, 00-0291 at p. 6, 785 So.2d at 84. Similarly, even though a plaintiff's petition may allege numerous claims for which coverage is excluded under an insurer's policy, a duty to defend may nonetheless exist if there is at least a single allegation in the petition under which coverage is not unambiguously excluded. Employees Insurance Representatives, Inc. v. Employers Reinsurance Corporation, 94-0676, p. 3 (La. App. 1st Cir.3/3/95), 653 So.2d 27, 29, writ denied, 95-1334 (La.9/1/95), 658 So.2d 1268.

"Occurrence" Under the Policy
In Gaylord Chemical Corporation v. ProPump, Inc., 98-2367 (La.App. 1st Cir.2/18/00), 753 So.2d 349, the insurer made the same argument as Scottsdale does here: that the failure to meet a contractual obligation to provide a workmanlike product does not constitute an "occurrence" under a CGL policy. There, we held that when the word "occurrence" is defined as an "accident," the occurrence of an unforeseen and unexpected loss constitutes an "accident" and therefore an "occurrence." Id., 98-2367 at p. 6, 753 So.2d at 354. We further noted that "[a]ccident is defined from the viewpoint of the victim; losses that were unforeseen and unexpected by the victim are the result of an accident." Id. In the context of this action, the "victim" would be the District, the third party who actually sustained the damage for which liability coverage is sought, rather than NATS. Thus, Agricultural's suit clearly claimed damages by reason of an "occurrence" as defined in the policy, and Scottsdale's coverage would apply absent exclusionary language or other policy conditions removing the event from the scope of the coverage. Scottsdale's assignment of error on this issue has no merit.

Work and Product Exclusions
Although the "work" and "product" exclusions are actually two separate exclusions, they are usually discussed together since some policy forms incorporate them in a single exclusion (a "work product" exclusion), and they address similar concepts. The exclusions in Scottsdale's policy provide as follows:
This insurance does not apply to:
. . .
k. Damage to Your Product
"Property damage" to "your product" arising out of it or any part of it.
l. Damage to Your Work
"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."[10]

*445 This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.
"Property damage" is defined in the policy as including "[p]hysical injury to tangible property, including all resulting loss of use of that property." As pertinent to this matter, "your product" is defined as "a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by [the insured]" and "b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products." "Your work" is defined as "a. Work or operations performed by you or on your behalf; and b. Materials, parts or equipment furnished in connection with such work or operations."
The definitions of "your product" and "your work" further provide that those terms include "a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of `your product' [or `your work']; and b. The providing of or failure to provide warnings or instructions." The first parts of these definitions seem to refer to an actual physical product or job result capable of sustaining physical damage, while the second parts refer to intangible activities forming part of the process of the insured's work.
The primary purpose of the "work" exclusion is to preclude liability coverage for an insured's own faulty workmanship, while the "product" exclusion serves the similar purpose of precluding coverage for damage to the insured's own product. See Lee R. Russ, et al., 9A Couch on Insurance § 129:19 (3rd ed.2006). Strictly construing these exclusions, we agree with the trial court that the BOAT clarifier cannot be considered either the "work" or the "product" of NATS, as opposed to that of APC/T & K or United, and thus the damages associated with its collapse are not excluded under either exception. See Gaylord, 98-2367 at pp. 8-9, 753 So.2d at 355-56. Scottsdale's assignment of error as to this issue has no merit.

Impaired Property Exclusion
The Scottsdale policy also contained the following exclusion, upon which Scottsdale relies:
This insurance does not apply to:
. . .
m. Damage to Impaired Property or Property Not Physically Injured
"Property damage" to impaired property" or property that has not been physically injured, arising out of:
(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.
This exclusion excludes coverage for damage to property that has not been physically injured or for which only loss of use is sought. See PCS Nitrogen Fertilizer, L.P. v. U.S. Filter/Arrowhead, Inc., 01-2577, p. 5 (La.App. 1st Cir.11/8/02), 834 So.2d 456, 459; Gaylord, 98-2367 at p. 8, 753 So.2d at 355. However, the exclusion does not apply where there is physical damage to property other than the insured's work or product. See Lee R. Russ, et al., 9A Couch on Insurance *446 § 129.21 (3rd ed.2006). As the damaged BOAT clarifier did not constitute NATS's work or product, and was unquestionably physically damaged, this exclusion plainly does not apply to exclude coverage. Thus, we find no merit in Scottsdale's assignment of error relating to this exclusion.

Professional Services
By means of policy endorsement CG 21 16 11 85, an additional exclusion was added to the policy, entitled "Exclusion  Designated Professional Services." At the bottom of the endorsement, the exclusionary language stated: "With respect to any professional services shown in the Schedule, this insurance does not apply to `bodily injury,' `property damage,' `personal injury' or `advertising injury' due to the rendering or failure to render any professional service." Under the heading of "Schedule," the title "Description of Professional Services:" was printed, under which the sole word "CONTRACTOR" was typewritten. Beneath that, the following language appeared: "(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)" In the original policy declarations, under the heading, "Business Description," the word "CONTRACTOR" was typewritten. The same single-word description was inserted for the insured's "Business Description" on the policy's supplemental declarations page. On an "Extension of Supplemental Declarations," the "Class Description" for premium purposes was described as "CONTRACTORS  EXECUTIVE SUPERVISORS OR EXECUTIVE SUPERINTENDENTS (PRODUCTS-COMPLETED OPERATIONS ARE SUBJECT TO THE GENERAL AGGREGATE LIMIT)."
Coverage for professional liability is usually excluded under CGL or other commercial liability policies, being usually provided under special policies, which, depending upon the profession or business, may be referred to as malpractice, errors and omissions (E & O), or professional liability policies. Even though the District did not specifically require NATS to maintain professional liability insurance in place, as opposed to CGL coverage, this fact is not determinative of the nature of those services it independently provided, apart from the professional services provided through NBS Lowry. The insurance requirements set out in the Contract were expressly designated as "minimum" requirements.
It must be noted that NATS agreed to provide those "professional services" required for "construction management," in turn required for "construction"; it did not agree to provide any professional services required for the actual physical construction of the RP-4 plant. Those services were plainly the province and duty of APC/T & K, the "construction contractor," and its subcontractors. The evidence is undisputed that the parties did not consider the Contract to be a construction contract and that the District considered APC/T & K to be the "contractor" in that respect. But we cannot agree that the term "contractor" should be interpreted so narrowly as to limit its meaning to that of a general or prime construction contractor, as urged by NATS. It is undisputed that NATS was formed for the sole purpose of serving as "Project Manager" for the design, construction, and implementation of the RP-4 plant; its role in that capacity was indisputably its sole "business." While not determinative of the point, the policy premium class description of "contractors  executive supervisors or executive superintendents" suggests a meaning *447 that seems to correspond with NATS's contractual title of "Project Manager."
Scottsdale's policy provides no definition of the term "professional services." "Professional services," in its usual connotation, means services performed by one in the ordinary course of the practice of his profession, on behalf of another, pursuant to some agreement, express or implied, and for which it could reasonably be expected some compensation would be due. Aker v. Sabatier, 200 So.2d 94, 97 (La.App. 1st Cir.), writs denied, 251 La. 48, 49, 202 So.2d 657, 658 (1967). In determining whether a particular act is professional in nature, a court should examine the character of the act itself, rather than the title or character of the party performing the act. American Casualty Company v. Hartford Insurance Company, 479 So.2d 577, 579 (La.App. 1st Cir.1985). Factors that should be considered are whether the act involved the exercise of professional judgment or required the exercise of a particular skill or discretion acquired by special training, or whether the act could have been done by an unskilled or untrained person. Id.[11]
It stands to reason that if NATS was required as part of its contractual obligation to "subcontract" with NBS Lowry, then NBS Lowry was its "subcontractor," and NATS can only be considered a "contractor" in that sense. Likewise, if NBS Lowry served as an "engineering sub-consultant," then NATS clearly fulfilled the role of a "consultant" to the District. The common meaning of the term "consultant" is "one who gives professional advice or services." Merriam-Webster's Collegiate Dictionary 249 (10th ed.1998). This definition accords with the role assigned to NATS in the Contract and described in the depositions of its corporate representative and that of the District. Based upon the record before us, we conclude that NATS occupied the composite role of expert consultant and contractor in fulfilling its duties as "Project Manager" for the complex technological project at issue.
In the complaint for damages of Agricultural's California suit relating to the collapse of the boat clarifier, Agricultural described the basis of NATS's alleged liability as founded upon both negligence and breach of contract,[12] including allegations that NATS "negligently managed, inspected, and supervised the construction, testing, and start-up of RP-4," "otherwise acted negligently in connection with the design, construction, testing and start-up of RP-4 such that on or about June 26, 1997 a treatment structure at RP-4 known as a BOAT clarifier failed and collapsed," and "negligently failed to take other steps to prevent the loss described above."
Our de novo review of the allegations of the Agricultural suit, considered in light of the Scottsdale policy terms, convinces us that coverage was not unambiguously excluded, even under the "professional services" exclusion. Those allegations *448 were broad enough to encompass acts of negligence that arguably might not have involved professional skill and judgment and, therefore, might have fallen outside the scope of the "professional services" contemplated by the Contract. Thus, we affirm that portion of the trial court's summary judgment finding that Scottsdale breached its legal duty to defend NATS in the Agricultural suit.
As to actual coverage under the policy, however, the uncontradicted evidence before us demonstrates that the property damages from the collapse of the BOAT clarifier were caused by NATS's failure to render professional services required of it as "Project Manager" under the Contract. It is undisputed that the District retained NATS's services as a consultant for the RP-4 plant project because of its expertise and familiarity with the particular process involved. It is worthy of note that the Contract did not limit the use of the term "professional services" to the professional engineering services NATS provided through its sub-consultant, NBS Lowry. In addition to its binding admission of liability forming the basis of the Agricultural suit's stipulated judgment, NATS's corporate representative admitted in his deposition taken in this action that NATS was aware of when the channel leak testing was being conducted by APC/T & K, was aware that a subcontractor or supplier was present installing chain wheels on water valves, and that NATS "should have done a better job" of coordinating the activities of the various personnel of the District, APC/T & K, NBS Lowry, and the subcontractor or supplier at the time of the BOAT clarifier collapse.[13] The latter duty fell squarely within NATS's admitted contractual responsibility for "professional services" as overall project liaison, thus rendering the "professional services" exclusion applicable.[14]
Accordingly, we reverse the trial court's judgment in part on this issue, and further render partial summary judgment in favor of Scottsdale, finding no coverage under its policy and no duty to indemnify NATS for the property damages at issue.

DECREE
The peremptory exception of res judicata of the defendant-appellant, Scottsdale Insurance Company, is overruled. The partial summary judgment in favor of the plaintiff-appellee, North American Treatment Systems, Inc., is affirmed as to the issues of the breach of Scottsdale Insurance Company's duty to defend and the inapplicability of the "work product" and "impaired property" exclusions, but reversed as to the issue of the inapplicability of the "professional services" exclusion. The trial court's judgment denying Scottsdale Insurance Company's motion for summary judgment is reversed, and partial summary judgment is hereby rendered in favor of Scottsdale Insurance Company, finding no coverage under its policy and no duty on its part to indemnify North American Treatment Systems, Inc. for the property damages at issue. The costs of this *449 appeal are assessed to the parties in equal proportions.
EXCEPTION OVERRULED; JUDGMENT AFFIRMED IN PART AND REVERSED AND RENDERED IN PART.
DOWNING, J., concurs.
NOTES
[1] The name of this public agency was later changed to Inland Empires Utilities Agency.
[2] The system performance guarantee, contained in an appendix to the Contract, included the following statement:

The proposed wastewater treatment system design is unique to the industry. In general, the technology incorporates oxidation ditches, intra-channel clarifiers, side skimmers, flow adjusting turbines, vertical turbine baffles, and automatic sludge age controllers. The system design utilizes equipment which is patented and exclusive to United Industries, Inc. and their [sic] associated engineers, contractors, and suppliers. There are no other existing designs or systems that could be construed as equivalent in this regard.
[3] The only issue assigned by the District that could be construed as bearing any relation to the collapse was No. 8, "Whether NATS must provide adequate gate reinforcement design and pay modification costs associated therewith relative to substandard gate structural design." NATS assigned certain issues that it contended involved potential third-party liability, including the District's assignment quoted above and NATS's contention that "the District is responsible for payment for the beam modifications and structural modifications to the BOAT which the District required."
[4] See n. 9, infra.
[5] The legal basis of the judgment was not stated therein. The trial court certified the judgment at issue as final for purposes of appeal pursuant to La. C.C.P. art. 1915(B). However, as the judgment dismissed Scottsdale as a defendant, certification of the judgment as final under La. C.C.P. art. 1915(B) was unnecessary. La. C.C.P. art. 1915(A)(1); La. C.C.P. art. 1911; Motorola, Inc. v. Associated Indemnity Corporation, 02-0716, pp. 10-11 (La.App. 1st Cir.4/30/03), 867 So.2d 715, 721.
[6] Although the inapplicability of the "work product" exclusions was not expressly mentioned in this motion, the trial court had ruled that they were inapplicable in its earlier ruling denying Scottsdale's original motion for summary judgment on the coverage issues, and the parties revived that issue in arguing their opposing motions for summary judgment at issue in this appeal.
[7] Louisiana jurisprudence has recognized this approach, based upon Section 24 of the Restatement (2nd) of Judgments (1982), in applying federal res judicata law and that of other states. See Reeder v. Succession of Palmer, 623 So.2d 1268, 1271-72 (La.1993), cert. denied, 510 U.S. 1165, 114 S.Ct. 1191, 127 L.Ed.2d 541 (1994); Brooks Well Servicing, Inc. v. Cudd Pressure Control, Inc., 36,723, pp. 6-7 (La.App. 2nd Cir.6/27/03), 850 So.2d 1027, 1032, writ denied, 03-2606 (La.12/12/03), 860 So.2d 1157.
[8] In its summary judgment in the first suit, the trial court evidently held that the contractual disputes forming the basis of the arbitration did not constitute an "occurrence" within the meaning of Scottsdale's policy, and, therefore, did not properly invoke its duty to defend and indemnify NATS. We can only surmise that in the second suit, the trial court employed the same pragmatic approach as we do now in rejecting Scottsdale's implied res judicata defense asserted in connection with its cross-motion for summary judgment.
[9] Included within the policy definition of "Suit" is "[a]n arbitration proceeding in which [property damages] are claimed and to which you must submit or do submit with our consent[.]"
[10] The "products-completed operations hazard" is defined as including "all . . . `property damage' occurring away from premises you own or rent and arising out of `your product' or `your work' except: (1) Products that are still in your physical possession; or (2) Work that has not yet been completed or abandoned."
[11] The cited case is interesting in that it held that the operative act in question was not "professional" in nature for purposes of coverage under a CGL policy, but was "professional" in nature for purposes of coverage under a professional liability policy. There, an elderly patient was injured as the result of a fall from an examination table at a physician's office, after being instructed by an EKG operator to remove his shirt and place himself on the table, without assistance. We held that the operator's instruction did not require the exercise of a particular skill or discretion, but that the physician employer's duty to protect his patient fell within the scope of his professional medical services. American Casualty, 479 So.2d at 579-80.
[12] A copy of the Contract was attached as an exhibit to the complaint.
[13] NATS concedes in its brief that its "managerial negligence contributed to an accidental destruction of property." (Emphasis supplied.)
[14] See Herzog Contracting Corporation v. Oliver, 35,219, pp. 9-11 (La.App. 2nd Cir.12/19/01), 805 So.2d 313, 319-20, writ denied, 02-0246 (La.3/28/02), 812 So.2d 632; Merlin B. Smith, Inc. v. Travelers Property Casualty, 35,695, pp. 5-7 (La.App. 2nd Cir.2/27/02), 811 So.2d 1097, 1101. See also Webster County Solid Waste Authority v. Brackenrich & Associates, Inc., 217 W.Va. 304, 617 S.E.2d 851, 859-60 (2005). But cf. Cochran v. B.J. Services Co. USA, 302 F.3d 499 (5th Cir.2002).