969 So.2d 653 (2007)
STEWART INTERIOR CONTRACTORS, L.L.C.
v.
METALPRO INDUSTRIES, L.L.C.
No. 2007-CA-0251.
Court of Appeal of Louisiana, Fourth Circuit.
October 10, 2007.
*655 Charles K. Chauvin, Thomas E. Loehn, Boggs, Loehn & Rodrigue, Metairie, LA, for Stewart Interior Contractors, L.L.C.
Glenn D. Price, Jr., Michael D. Peytavin, Gaudry Ranson Higgins & Gremillion, L.L.C., Gretna, LA, for Nautilus Insurance Company.
Bryan C. Reuter, Thomas P. Owen, Jr., Melissa Vanderbrook Beaugh, Stanley, Flanagan & Reuter, L.L.C., New Orleans, LA, for MetalPro Industries, L.L.C.
(Court Composed of Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, JR., and Judge ROLAND L. BELSOME).
MAX N. TOBIAS, JR., Judge.
MetalPro Industries, L.L.C. ("MetalPro"), and Stewart Interior Contractors, L.L.C. ("Stewart"), appeal from the trial *656 court's grant of summary judgment in favor of Nautilus Insurance Company ("Nautilus"), finding the commercial general liability policy issued by Nautilus to MetalPro may afford coverage for some, but not all, of the damages claimed by Stewart. For the reasons that follow, we affirm the trial court's granting of summary judgment in part, reverse in part, and remand the matter to the trial court for further proceedings consistent with this opinion.
I. FACTS AND PROCEDURAL HISTORY
Stewart was subcontracted by Gootee Construction, a general contractor, to install metal stud framing and gypsum wall board (sheetrock) panels in connection with the construction of a new administrative building on the campus of the University of New Orleans ("UNO"). Thereafter, Stewart subcontracted with MetalPro for the manufacture, fabrication, and delivery of steel studs to the construction site to be used by Stewart for the sheetrock installation in the new building. The steel studs formed the framing for the sheetrock built into the construction project. At the time of manufacture, delivery, and installation, MetalPro had in force a commercial general liability ("CGL") insurance policy issued by Nautilus.
Following delivery and subsequent installation of the steel studs, Stewart was notified that drywall screws were pulling through the sheetrock on the third and fourth floors of the building. Stewart further learned of damage to the gypsum wall board panels, tape and joint compound, interior paint finishes, vinyl base boards, and the carpet on the third and fourth floors (hereinafter referred to as the "sheetrock job"), allegedly caused by use of the steel studs. Investigation performed by Stewart revealed that the steel studs manufactured and supplied by MetalPro did not meet generally accepted specifications and tolerances required by the industry and, additionally, failed to meet the UNO construction project specifications. As a result, Stewart filed the instant action against MetalPro and Nautilus, as its insurer, seeking to recover damages caused by the alleged defective steel studs under the Louisiana Products Liability Act ("LPLA"), for breach of contract, and in redhibition.
In response to Stewart's Petition for Damages, MetalPro filed exceptions of improper venue, prescription, and no cause of action. These exceptions were never heard, and MetalPro has not yet filed an answer. Nautilus timely filed its own exception of improper venue and subsequent answer to Stewart's petition. Nautilus' exception for improper venue was also never heard. Thereafter, Nautilus moved for summary judgment, admitting it provided a CGL insurance policy to MetalPro covering the time period at issue, but claiming its policy excludes from coverage the property damage Stewart alleges was caused by the steel studs in this case. After a hearing, the trial court granted the motion for summary judgment and dismissed all claims against Nautilus. No written reasons were assigned. This appeal followed.
As a threshold issue, we must decide whether the trial court's consideration and ruling on Nautilus' motion for summary judgment prior to hearing and rendering judgment on pending exceptions of improper venue, prescription, and no cause of action, was procedurally "premature," and manifestly erroneous as asserted by MetalPro. We find, under the facts of this case, it was not.
The crux of MetalPro's argument, relying on Peterson v. Hanson, 03-1448 (La. App. 1 Cir. 9/17/04), 897 So.2d 32, is that if, in fact, venue is improper in Orleans Parish, *657 the trial court's granting of Nautilus' summary judgment motion is null and void. MetalPro's reliance on Peterson for this proposition is misplaced. In Peterson, the defendants raised an exception of improper venue to plaintiff's action for a preliminary injunction. After sustaining the defendants' venue exception and transferring the matter to a parish of proper venue, the trial court then proceeded to rule on the merits of the case. In vacating that portion of the judgment denying plaintiff's application for preliminary injunction, the appellate court held that once the trial court sustained the defendant's venue exception it thereafter lacked jurisdiction to rule on the merits of the case and, therefore, that portion of the judgment denying the injunction was null. Id., p. 4, 897 So.2d at 34.
Unlike Peterson, in the case sub judice, venue has never been declared improper, nor was the matter transferred to another parish. Thus, at the time the trial court considered, and thereafter granted, Nautilus' summary judgment motion, it properly exercised jurisdiction over Nautilus in this action.[1] Specifically, La. C.C.P. art. 966 A(1) provides that a plaintiff's motion for summary judgment may be made at any time after an answer has been filed. The defendant's motion, however, may be made at any time. Accordingly, while a court must rule on pending declinatory exceptions prior to ruling on a plaintiff's motion for summary judgment when the defendant has not yet filed an answer, there is nothing in our Code of Civil Procedure that prevents a court from entertaining a defendant's summary judgment motion brought at any time during the course of the proceedings, even prior to ruling on a defendant's previously filed declinatory exception of improper venue. La. C.C.P. art. 966 A(1). See Williams v. Montegut, 99-2119 (La.App. 4 Cir. 2/2/00), 752 So.2d 329.[2]
MetalPro next argues that, by granting Nautilus' summary judgment motion dismissing Nautilus from this suit prior to ruling on MetalPro's pending declinatory exceptions, MetalPro's substantive rights have been adversely affected even though it has never made a voluntary appearance in this action. Again, MetalPro's argument rings hollow. Louisiana law is clear that waiver of venue by one defendant[3] does not preclude another defendant from objecting to venue, as a "waiver of venue does not make improper venue proper." See Spott v. Otis Elevator Company, 601 So.2d 1355, 1360 (La.1992); Habig v. Popeye's, Inc., 553 So.2d 963, 966-67 (La.App. 4 Cir.1989). Therefore, assuming venue in this action is improper in Orleans Parish as to MetalPro, to the extent Nautilus' waived venue as to itself, this does not *658 make venue proper as to MetalPro, and MetalPro is free to set the hearing on its declinatory exceptions filed over two years ago. MetalPro has had ample time to seek a ruling on its declinatory exceptions, but has failed to do so. Even though MetalPro has asserted it has been "prejudiced" by the trial court's alleged premature granting of Nautilus' summary judgment motion  other than the obvious determination of no coverage under its CGL policy  it has failed to set forth any showing of prejudice. As nothing in Louisiana law prohibits a defendant from waiving venue as to itself, and because our Code of Civil Procedure specially allows a defendant to proceed with a motion for summary judgment "at any time," MetalPro has failed to establish the trial court erred when it ruled on Nautilus' motion for summary judgment prior to rendering judgment on the declinatory exceptions in this case. This assignment of error is without merit.
We now proceed to review the correctness of the trial court's ruling granting Nautilus' summary judgment motion and finding that, as a matter of law, the Nautilus policy issued to MetalPro precludes coverage for all of the damages asserted against it by Stewart. We review a grant of summary judgment de novo applying the same standard as the trial court. Supreme Services and Specialty Company, Inc. v. Sonny Greer, Inc., 06-1827 (La.5/22/07), 958 So.2d 634.
II. SUMMARY JUDGMENT
A summary judgment may be rendered on the issue of insurance coverage alone, although a genuine issue as to liability or the amount of damages exists. See La. C.C.P. art. 966 E; Leflore v. Coburn, 95-0690 (La.App. 4 Cir. 12/28/95), 665 So.2d 1323. A summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, exists under which coverage could be afforded. Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94), 634 So.2d 1180, 1183. An insurer seeking to avoid coverage through summary judgment must prove that some exclusion applies to preclude coverage. McMath Const. Co., Inc. v. Dupuy, 03-1413, p. 4 (La.App. 1 Cir. 11/17/04), 897 So.2d 677, 681.
An insurance policy is a conventional obligation that constitutes the law between the insured and the insurer, and the agreement governs the nature of their relationship. See La. C.C. art. 1983. Moreover, an insurance policy is a contract, which must be construed employing the general rules of interpretation of contracts. Supreme Services, supra at p. 5, 958 So.2d at 638; Reynolds, 634 So.2d at 1183; La. C.C. arts. 2045-2057. If the insurance policy's language clearly expresses the parties' intent and does not violate a statute or public policy, the policy must be enforced as written. See La. C.C. art. 2046; Rando v. Top Notch Properties, L.L.C., 03-1800 (La.App. 4 Cir. 6/2/04), 879 So.2d 821. Courts are not at liberty to alter the terms of insurance policies that are unambiguous. Edwards v. Daugherty, 03-2103 (La.10/1/04), 883 So.2d 932. However, if any doubt or ambiguity exists as to the meaning of a provision in an insurance policy, it must be construed in favor of the insured and against the insurer. See La. C.C. art. 2056. When the ambiguity relates to an exclusionary clause, the law requires that the contract be interpreted liberally in favor of coverage. Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081, 1090 (La.1983); Williamson v. Historic Hurstville Ass'n, 556 So.2d 103, 107 (La.App. 4 Cir.1990).
*659 Liability insurance policies should be interpreted to effect, rather than to deny coverage. Yount v. Maisano, 627 So.2d 148, 151 (La.1993). However, it is well-settled that, absent a conflict with statutory provisions or public policy, insurers are entitled to limit their liability and to impose reasonable conditions upon the obligations they contractually assume. Supreme Services, supra at p. 6, 958 So.2d at 638-639; Reynolds, 634 So.2d at 1183; Marcus v. Hanover Insurance Co., Inc., 98-2040, p. 4 (La.6/4/99), 740 So.2d 603, 606. In these circumstances, unambiguous provisions limiting liability must be given effect. Supreme Services, supra at p. 6, 958 So.2d at 639. Only if the language can reasonably be read to have more than one reasonable meaning can the language be said to be ambiguous. Rando, supra at p. 3, 879 So.2d at 825. Whether a contract provision is ambiguous is a question of law. Pope v. Khalaileh, 05-0027, p. 5 (La.App. 4 Cir. 6/1/05), 905 So.2d 1149, 1152. Moreover, Nautilus bears the burden of proving that a loss falls within a policy exclusion. Blackburn v. National Union Fire Ins. Co., 00-2668, p. 6 (La.4/3/01), 784 So.2d 637, 641; Rando, supra at p. 3, 879 So.2d at 825.
Turning to the language of the Nautilus policy, we next determine whether, on the record before us, Stewart has alleged "property damage" so as to trigger the initial grant of coverage for MetalPro's alleged liability under Nautilus' CGL policy.
A. The "Property Damages" Alleged by Stewart
In its petition, Stewart avers that MetalPro manufactured and delivered steel studs for the UNO construction project that were defective because the studs failed to meet generally accepted specifications and tolerances required by the industry, as well as failed to meet the UNO construction project specifications. Stewart posits several theories of recovery against MetalPro, including design, manufacture, and warning deficiencies under the LPLA, redhibition, and breach of contract. Specifically, Stewart alleges that, as a result of the defective steel studs, it suffered damages, including: the costs of the steel studs; installation, repair and removal costs; loss of income, profits, capital, and monies withheld under the contract; expert, engineering, and attorney's fees; and costs associated with delays in the construction project.
In addition to Stewart's petition, the affidavit of Stewart's president, Gordon Stewart, delineates additional damages occasioned to the third and fourth floors of the new UNO administrative building where MetalPro's steel studs were used in their construction. These alleged damages include physical damage to the sheetrock job.
B. The Nautilus CGL Policy
In general, a commercial general liability ("CGL") insuring agreement, such as the CGL policy issued by Nautilus to MetalPro, is a broad statement of coverage, and insurers limit their exposure to risk or liability for damages through a series of specific exclusions. We first determine whether the losses claimed by Stewart are covered by the language of the insuring agreement's initial grant of coverage.
1. The Nautilus Insuring Agreement
The Nautilus policy issued to MetalPro states that the insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies." It further states that "[t]his insurance applies to `bodily injury' or `property damage' only if: . . . The *660 `bodily injury' or `property damage' is caused by an `occurrence' that takes place in the `coverage territory' . . . during the policy period."
The parties do not dispute that MetalPro's liability to Stewart relative to the allegedly defective steel studs arises out of an "occurrence" within the "coverage territory" during the "policy period." Hence, whether the insuring agreement provides coverage in this case hinges upon (1) whether Stewart's claims for damages arise out of "property damage" as defined in the Nautilus policy and, if so, (2) whether Nautilus' policy nevertheless contains one or more exclusions that explicitly eschews coverage for all of the claims made by Stewart against MetalPro.
The Nautilus policy defines "property damage," in relevant part, as follows:
a. Physical damage to tangible property, including all resulting loss of use that property. All such losses of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
Nautilus characterizes Stewart's claims against MetalPro as claims solely for economic losses, i.e., breach of contract and redhibition damages due to the misrepresentation of the condition or quality of products. Nautilus argues claims for pure economic losses such as those alleged by Stewart are not "claims for damages arising out of `property damage' as defined by the Nautilus policy," and, therefore, coverage under the Nautilus insuring agreement is not triggered. Conversely, MetalPro and Stewart argue that the damages Stewart contends it sustained as a result of the defective studs represent a loss of property and constitute "property damage" as defined by the Nautilus policy.[4] We agree with MetalPro and Stewart and find that, to the extent summary judgment was granted on the basis that Stewart failed to allege "property damage" triggering the initial grant of coverage under the Nautilus policy, the trial court erred.
If, as Nautilus contends, losses actionable for breach of contract or redhibition can never constitute "property damage" for purposes of the initial grant of coverage in a CGL policy, then the "impaired property" or other similar exclusions would be entirely superfluous and unnecessary. For example, the "impaired property" exclusion, discussed infra, eliminates coverage for an insured's liability for property damage to the insured's own work or product, and liability solely for loss of use attendant to the repair of it's own defective work or product. If the insuring agreement never confers coverage for this type of liability as an original definitional matter, there would be no need to specifically exclude it.
The Lawyer and Harding cases relied upon by Nautilus are inapposite.[5] In each case, the plaintiffs' allegations for damages *661 resulting from breach of contract and negligent misrepresentation arose out of the sale and purchase of real estate, not with a construction project, and were limited solely to economic damages (not "property damages"). Specifically, both the Lawyer and Harding plaintiffs claimed they did not get the home they bargained for because the sellers had misrepresented the condition of the homes at the time of purchase. Contrary to the allegations made by the plaintiffs in Lawyer and Harding, Stewart contends MetalPro's failure to produce steel studs that met the contract specifications resulted, not only in economic losses due to the consequential loss of income and profits from the delay in the construction project, but in physical damages to tangible property; namely, to the sheetrock job.
Furthermore, we find that Nautilus' reliance on Gaylord Chemical Corp. v. Propump, Inc., 98-2367, (La.App. 1 Cir. 2/18/00), 753 So.2d 349, for the proposition that Stewart's claims against MetalPro do not constitute claims for "property damage," which would trigger coverage of the Nautilus policy, is likewise misplaced.[6] In Gaylord, at issue was not whether "property damage" was sustained  as is the issue in the instant matter  but rather, whether the seller's misrepresentation of the pump constituted "an occurrence" such that coverage was triggered. Moreover, Propump's concession that its redhibition claims were not "covered" claims under its CGL policy, was not a concession that redhibition claims can never constitute "property damage" for purposes of triggering coverage under the insuring agreement as espoused by Nautilus herein. Rather, it was a recognition that purely redhibition, or claims solely for economic losses, are generally not covered by CGL policies because of policy exclusions restricting coverage for damages, such as the "work product" exclusion, and not on any inherent limitation in the general grant of coverage for "property damage" as required by the insuring agreement.[7] Accordingly, Gaylord must not be read for the proposition that a loss actionable in contract or redhibition, rather than in tort, can never constitute "property damage" or an "occurrence" under a CGL policy for purposes of triggering coverage under the insuring agreement.
Stewart's petition alleges claims for breach of contract, redhibition, and damages. The petition further prays for an award of general damages, special damages, expert fees, and attorney's fees. A review of the record shows a dispute exists as to whether Stewart has alleged solely a contractual breach and redhibition action for economic losses, or whether Stewart alleges contractual breach, redhibition, in addition to other allegations of liability based in tort.[8] As our case law presupposes *662 that "[a] plaintiff's complaint against the insured is examined with the assumption that all the allegations are true,"[9] we disagree with Nautilus and find that, in addition to economic losses, Stewart has sufficiently alleged that there may have been damage to property other than to the steel studs themselves, or incident to their removal and repair, thereby triggering coverage under the insuring agreement of the Nautilus CGL policy issued to MetalPro.[10]
Having concluded Stewart's claims for "property damage" trigger the initial grant of coverage under Nautilus' insuring agreement does not end our inquiry. We must reverse the trial court's grant of summary judgment in favor of Nautilus unless coverage for Stewart's property damage claims is precluded by one or more of the policy exclusions.
2. Policy Exclusions
The Nautilus policy contains several exclusions, three of which require our examination: exclusion (b), for contractually-assumed liabilities; exclusion (k), for property damages to the insured's product; and exclusion (m), for property damage to impaired property or property that has not been physically injured. We examine the applicable policy provisions and exclusions to determine whether the trial court erred in finding that coverage for all of the damages asserted by Stewart is precluded as a matter of law, or whether coverage is protected by the policy's products-completed operations hazard ("PCOH") provision for at least some of the damages claimed.

a. Contractually-Assumed Liability Exclusion

In addition to damages, Stewart's petition sets forth claims against MetalPro for redhibition and breach of contract. Nautilus avers that, in Louisiana, redhibition and breach of contract damages are excluded under CGL policies such as the CGL policy issued by Nautilus to MetalPro, and thus, no coverage exists for these claims as a matter of law.[11] MetalPro and Stewart both argue that the Nautilus "contractual liability" exclusion is inapplicable to the facts and circumstances of this case because there has been no showing that MetalPro assumed liability under its contract or agreement with Stewart. We agree.
The "contractual liability" exclusion denies coverage for claims arising out of:
b. "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

*663 (1) That the insured would have in the absence of the contract or agreement; or
(2) Assumed in a contract or agreement that is an "insured contract", provided the . . . "property damage" occurs subsequent to the execution of the contract or agreement.
The Nautilus policy defines "insured contract" as
9. "Insured Contract" means:
f. That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed in the absence of any contract or agreement.
This exclusion generally operates to deny coverage when the insured assumes responsibility for the conduct of a third party. See William Shelby McKenzie and H. Alston Johnson, III, Insurance Law and Practice § 189, 15 La. Civil Law Treatise (3rd Ed.2006). See also Broadmoor Anderson v. National Union Fire Insurance Company of Louisiana, 40,096, p. 12 (La.App. 2 Cir. 9/28/05), 912 So.2d 400, 407. As MetalPro is not being sued as the contractual indemnitor of a third party's conduct, but rather for its own conduct, we conclude the exclusion is inapplicable in this case. Moreover, even if we were to find that the contractual liability exclusion were somehow applicable to situations in which the insured is being sued for its own conduct, the exclusion would not apply here. The record is devoid of any evidence of an indemnity or hold harmless agreement existing between Stewart and MetalPro, and therefore, we hold that the "contractual liability" exclusion is inapplicable to the coverage issue presented in the instant case. Accordingly, to the extent the trial court's grant of summary judgment in favor of Nautilus was based on a finding that the "contractual liability" exclusion precluded coverage for the claims asserted by Stewart, we find the trial court erred.

b. The Impaired Property Exclusion

Nautilus contends that coverage for the damages claimed by Stewart is further precluded by the "impaired property" exclusion contained in its CGL policy. This exclusion denies coverage for claims arising out of:
m. "Property damage" to "impaired property" or property that has not been physically injured arising out of:
(1) A defect, deficiency, inadequacy, or dangerous condition in "your product" or "your work"; or
(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.
The Nautilus policy defines "impaired property," in pertinent part, as "tangible property, other than `your product' or `your work', that cannot be used or is less useful because . . . [i]t incorporates `your product' . . . that is known or thought to be defective . . . if such property can be restored to use by . . . [t]he repair . . . or removal of `your product.'"
Specifically, Nautilus contends that Stewart's claims, i.e., that MetalPro was supposed to provide steel studs that met contract specifications, but failed to do so causing Stewart to incur costs due to delay in completion of the UNO construction project while the repairs caused by *664 the studs were undertaken, are for loss-of-use costs excluded by the "impaired property" exclusion. Nautilus' contentions, however, are based on one, or both, of the following assumptions: (a) that property other than the steel studs, or attendant to their removal and/or repair, was not physically injured as a result of MetalPro's failure to provide steel studs that met contract specifications, and/or (b) that all of the delay costs and loss of profits incurred by Stewart were due to delays associated with the removal and/or repair of MetalPro's steel studs.[12]
We find the "impaired property" exclusion to be clear and unambiguous. The exclusion precludes coverage for damage to property that has not been physically injured or for which only loss of use is sought. See North American Treatment Systems, Inc. v. Scottsdale Ins. Co., 05-0081, pp. 24-25 (La.App. 1 Cir. 8/23/06), 943 So.2d 429, 445-46; PCS Nitrogen Fertilizer, L.P. v. U.S. Filter/Arrowhead, Inc., 01-2577, p. 6 (La.App. 1 Cir. 11/8/02), 834 So.2d 456, 459. On the other hand, the exclusion does not apply where there is physical damage to property other than the insured's work or product after the product has been put to its intended use. Gaylord, supra at p. 7, 753 So.2d at 355. See Lee R. Russ, et al., 9A Couch on Insurance § 129.21 (3rd ed.2006). See also Superior Steel, Inc. v. Bituminous Cas. Corp., 415 So.2d 354 (La.App. 1 Cir. 1982).
In the instant case, we find there remain genuine issues of material fact precluding summary judgment regarding the applicability of the "impaired property" exclusion. Nautilus' contention that the only damages Stewart maintains it sustained arise out of property damage and loss of use related solely to the steel studs themselves, or consequences of having to go back and repair the steel studs, is not conclusively discernable from the record.
A review of the summary judgment evidence, particularly the affidavit of Stewart's president, Gordon Stewart, reveals that Stewart has alleged physical damages to tangible property other than to the steel studs (i.e., to the sheetrock job), and loss of use and profits resulting from the delay in completion of the UNO construction project in order to repair the damages to this other property. However, it is unclear from the record before us whether Stewart's alleged damages to "other" property are, in fact, solely attendant to the removal and repair of the allegedly defective steel studs.
Consequently, we hold that, to the extent the evidence shows damages arising out of, or solely incidental to, the removal and/or repair of the allegedly defective steel studs, the Nautilus policy clearly excludes *665 coverage for these damages under the "impaired property" exclusion. But, to the extent Stewart has alleged and can prove damages for loss of use, and property damages caused by the steel studs that were occasioned to property other than the steel studs and unrelated to their removal and/or repair, then the "impaired property" exclusion does not apply to preclude coverage for these specific items of damages.

c. The "Products-Completed Operations Hazard" Provision and the "Your Product" Exclusion

MetalPro argues that coverage for Stewart's property damage claims, or at least some of them, arising out of MetalPro's steel studs is afforded by the Nautilus policy under the PCOH provision, which provides coverage for property damage arising out of an insured's completed product or work performed away from the insured's premises.[13] Conversely, Nautilus avers that coverage for all of Stewart's claims are precluded by the "your product" exclusion, which eliminates coverage for "property damage" to "your product" arising out of it or any part of it.[14] Alternatively, MetalPro contends there is an inherent conflict existing between the *666 "your product" exclusion[15] and the PCOH provision that cannot be reconciled, thus creating an ambiguity in favor of coverage. See La. C.C. art. 2056.
In light of the Louisiana Supreme Court's recent decision in Supreme Services and Specialty Co. v. Sonny Greer, Inc., 06-1827 (La.5/22/07), 958 So.2d 634,[16] which interpreted policy provisions identical to the provisions presently before us, we hold that no inherent conflict between the PCOH provision and the "work product" exclusion exists so as to cause an ambiguity in the Nautilus policy.[17] Instead, at issue in the case sub judice is whether, when applying both provisions, coverage for all of the damages alleged by Stewart is precluded under the Nautilus policy's "work product" exclusion, or whether coverage for some of the damages alleged is protected by the policy's PCOH provision.
In Supreme Services, the property owner sued its general contractor for breach of contract and warranties, seeking recovery for damages resulting from the general contractor's alleged defective design and faulty construction of concrete slabs poured by its subcontractors on a construction project. The general contractor made demand against its CGL insurer seeking coverage for its liability to repair or replace the cracked concrete slabs.[18] The CGL insurer moved for summary judgment arguing its policy's "work product" exclusion expressly precluded coverage for improper construction by the insured's own workers or any of its subcontractors. The trial court agreed and granted the insurer's motion. On appeal, the court reversed finding the "work product" exclusion was inapplicable to the work performed by the subcontractors, and that the PCOH provision was ambiguous requiring an interpretation of the policy in favor of coverage. Supreme Services, supra at p. 3, 958 So.2d at 637. The Supreme Court granted writs to determine whether the policy afforded coverage for the faulty workmanship performed by, or on behalf of, *667 the contractor, and to address the conflict, if any, between the policy's PCOH provision and its "work product" exclusion. Id.
After reviewing both the "work product" exclusion and the PCOH provision, and conducting an analysis of existing Louisiana law addressing the same or similar provisions, the Supreme Court held there were no contradictions or ambiguities in the language of these two policy provisions. In so holding, the Supreme Court stated:
Under the "work product" exclusion, the insured or its subcontractor becomes liable for damage to its work or its product caused by its faulty workmanship. Under the PCOH provision, damages other than the faulty work product or work itself, arising out of the faulty workmanship are covered by the policy. Stated differently, if a subcontractor's faulty electrical work caused the building to burn down before completion, the "work product" exclusion would eliminate coverage for the faulty electrical work performed by the contractor or subcontractor. However, the operations hazard coverage applies not to the faulty work, but [to] damage arising out of the faulty work (fire damage) would not be excluded as it would be covered under the PCOH provision.
Supreme Services, supra at pp. 16-17, 958 So.2d at 645.
The claim involved in Supreme Services was limited exclusively to damages to the work product itself  the cracked concrete slab  not a claim for damages to other property arising out of the work or product and covered under the PCOH provision. Thus, the protection for the work performed by the contractor under the PCOH damage section of the CGL policy was not triggered and did not come into play. Consequently, the Supreme Services Court stated:
In other words, the PCOH provision only applies to those injuries [or damage] which might occur as a result of the damaged product. In the instant case there is no need to delineate the PCOH provision because there is no other product damaged or third person injured. Here, the only applicable provision is the "work product" exclusion, which applies to work performed by [the general contractor.][19]
Because the damages claimed in Supreme Services fell squarely within the "work product" exclusion precluding coverage for all the damages claimed, the Supreme Court closely examined the "work product" exclusion and provided the following legal precepts concerning the basis of the exclusion and how and when the exclusion applies:
 The "work product" exclusion reflects the insurance industry's intent to "avoid the possibility that coverage under a CGL policy will be used to repair and replace the insured's defective products and faulty workmanship."[20]
 A CGL policy is not written to guarantee the quality of the insured's work or product.[21]

*668  The "exclusionary language in [the] liability policy makes it clear that damage to the product itself is excluded from coverage."[22]
 The CGL policy "excludes coverage for damage to property on which the [insured] . . . worked" and further "excludes coverage to property that must be repaired or replaced because the [faulty] work performed by the [insured] was incorrectly performed."[23]
 "Louisiana courts have consistently held that a CGL policy containing the "work product" exclusion eliminates coverage for the costs of repairing or replacing the insured's own defective work or defective product."[24]
 While "repair and replacement costs for faulty work are excluded . . . any damage to other property that may result is included."[25]
Thus, applying the above legal precepts to the allegations of damages made by Stewart against MetalPro herein, it is clear the Nautilus policy precludes coverage for Stewart's claims for damages to MetalPro's allegedly defective steel studs, all costs related to the replacement of the steel studs, and for any damage to property attendant to their removal and/or repair, including any loss of use or profits caused by the delay in completion of the UNO construction project during the removal and/or repair process.
Dissimilar to Supreme Services where the PCOH provision was deemed inapplicable to the property damage claims made against the insured, because we find the claims asserted herein by Stewart (i.e., for damage to property other than to MetalPro's allegedly defective steel studs), potentially trigger coverage under the protection of Nautilus' PCOH provision, we analyze the provision.
PCOH coverage applies to property damage arising out of the insured's product or work when all of the work in its contract is performed away from the insured's premises and has been completed, even if the product or work may need some correction, repair, or replacement. William Shelby McKenzie and H. Alston Johnson, III, Insurance Law and Practice *669 § 186, p. 370, in 15 Louisiana Civil Law Treatise (2nd Ed.1996). See also McMath, supra at p. 7, 897 So.2d at 682. The purpose of the PCOH provision is to afford coverage to insureds for liability arising out of damage occasioned to property other than to their own work or product when the insured's work or product has been completed.
The PCOH provision is further explained by McKenzie and Johnson, as follows:
This provision can clearly be explained by this example:
Suppose an insured contracted to make and install a sign on a commercial building. After the work was completed, the sign fell due to defective installation, causing damage to the sign, the building's canopy, a parked car, and also bodily injury to a pedestrian. The insurer covering the products-completed operations hazard would cover all claims except the contractor's responsibility to repair and replace the sign, coverage for which would be excluded under the product and work exclusions.[26]
Applying the above interpretation of the PCOH provision to the claims for damages asserted by Stewart contained in the record, protection of the PCOH provision is arguably triggered to afford coverage for at least some of the alleged property damage claims Stewart asserts against MetalPro. The PCOH protection includes coverage for property damage arising out of MetalPro's product (i.e., the steel studs), when production and delivery of the product called for in the contract was complete (i.e., upon MetalPro's delivery of the steel studs to the construction site), and the work (use of the steel studs in the construction of the administration building) occurred away from MetalPro's premises.[27] Thus, to the extent the damages occasioned to the sheetrock job were damages to "other property" as defined in the Nautilus policy, and applicable case law cited herein interpreting it, protection and coverage under the PCOH provision is triggered providing coverage for these specific damages.
Accordingly, based on the record before us, and in accordance with the Supreme Court's holding in Supreme Services, supra, we affirm the trial court's grant of summary judgment finding that the Nautilus CGL policy's "work product" exclusion unambiguously excludes coverage for the damages alleged by Stewart caused to MetalPro's defective steel studs, the cost to replace the steel studs, and for any damage attendant to their repair and/or removal. We further conclude, however, that the trial court erred in its grant of summary judgment in favor of Nautilus, excluding coverage for all of Stewart's alleged property damage claims. We find there remain genuine issues of material fact precluding summary judgment determination as to whether all, or any, of the damages alleged by Stewart occasioned to the sheetrock job trigger protection of the PCOH provision, and which of these damages, if any, are precluded by the "work product" exclusion. Therefore, we reverse the trial court's ruling as to these alleged *670 damages and remand the matter for consideration of additional evidence in accordance with the Supreme Court's holding in Supreme Services and in accordance with the findings and conclusions of law set forth in this opinion.
On remand, if Stewart is able to adduce evidence proving its alleged damages were not attendant to or caused solely as a result of the removal and repair of MetalPro's allegedly defective steel studs, then the Nautilus policy provides coverage under the PCOH provision as delineated above for these damages. To the extent, however, the evidence presented on remand establishes that Stewart's alleged damages were caused exclusively as a result of or during the removal and repair of the steel studs, then the Nautilus policy unambiguously precludes coverage under the "work product" exclusion, and summary judgment excluding all damages from coverage under the Nautilus policy at that time would be appropriate.

C. Stewart's Claims Under the Louisiana Products Liability Act And For General Damages
In its original motion for summary judgment, and again in its appellee brief, Nautilus contends that Stewart cannot maintain an action under the LPLA for its claims due to deficiencies in design, manufacture, and warning relating to MetalPro's steel studs, as these claims are solely for economic losses that do not fall within the Act's definition of "damage." Specifically, Nautilus contends, once again, that Stewart seeks recovery for claims limited solely to redhibition and breach of contract, which "damages" are not compensable under the LPLA, and are general damages recoverable arising out of purely economic losses. Nautilus continues to ignore the record evidence, which shows that Stewart's allegations of damages sustained are, arguably, not limited to damages arising solely out of economic losses, as addressed at length herein.
Stewart maintains that, contrary to Nautilus' contentions, it has asserted a valid claim against MetalPro under the LPLA for damages to property other than to MetalPro's defective product and not limited to solely economic losses, providing another basis for recovery under the Nautilus policy. MetalPro asserts that the issue of whether Stewart has alleged valid claims for recovery under the LPLA or for general damages is irrelevant to the issue of coverage under the Nautilus policy upon which the trial court granted summary judgment. We agree.
Based on our review of the record evidence, we find that Stewart has sufficiently alleged physical damage to property other than to MetalPro's steel studs alone and, as such, Stewart's request for recovery in this case is not limited to recovery for purely economic losses. Consequently, Stewart's allegations are sufficient to maintain an action against MetalPro for damages under the LPLA. The same reasoning holds true for Stewart's claims for general damages. Accordingly, to the extent the trial court's grant of summary judgment rested on a finding that, based on Stewart's allegations for damages to property resulting from the use of MetalPro's defective steel studs in a construction project, Stewart cannot maintain an action under the LPLA or for general damages; further, Stewart's potential recovery based on these allegations is limited solely to economic losses in redhibition and for breach of contract, we find that the trial court erred.

CONCLUSION
We find the trial court did not err in its consideration and ruling upon Nautilus' summary judgment motion prior to rendering *671 judgment on MetalPro's declinatory exceptions, which MetalPro has not waived and may still set for hearing.
We further find that MetalPro and Stewart have adduced sufficient summary judgment evidence to show that Stewart's pleadings contain allegations of "property damage" caused by an occurrence during the policy period, thereby triggering the initial grant of coverage under the Nautilus insuring agreement. This shifted the burden to Nautilus to show that one or more of its policy exclusions apply to unambiguously preclude coverage for all of the claims asserted by Stewart. We find that Nautilus has only partially carried its burden.
Accordingly, we (1) affirm the trial court's granting of summary judgment finding that the Nautilus CGL policy precludes coverage for those claims asserted by Stewart seeking damages related solely to the costs of MetalPro's steel studs, the costs to replace the steel studs, the costs to remove and repair the steel studs, for all costs arising out of the repair of damages to property necessitated by the repair and removal of the steel studs, the loss of use, income, profits, and fees, et cetera related to the delay in completion of the construction project necessitated by the need to remove and repair the steel studs and perform repairs to property damaged during the removal and repair process; (2) reverse the trial court's grant of summary judgment to the extent the court found there existed no genuine issue of material fact regarding whether the Nautilus policy unambiguously excluded coverage for all of Stewart's claims of damage, including damage to the gypsum wall board panels, tape and joint compound applied to the gypsum wall board panels, paint finishes, carpet and carpet base, and vinyl base boards occasioned to the third and fourth floors of the UNO administration building; and (3) remand the matter to the trial court for further proceedings in accordance with this opinion for purposes of admitting and considering evidence regarding the "causation" and exact nature of the alleged damage to property other than the steel studs or incident to their removal and repair (i.e., were these damages caused by the steel studs during their removal and repair process and, thus, precluded from coverage under the "your product" and/or "impaired property" exclusions; or caused after the steel studs were incorporated into the construction, but prior, or unrelated, to the removal and repair process and, thus, protected by the PCOH provision; or some combination of both resulting in some damages claimed being covered and some damages claimed being excluded from coverage).
For the foregoing reasons, we further hold that Stewart has alleged damages to property sufficient to maintain an action under the Louisiana Products Liability Act and for general damages in this case.
AFFIRMED IN PART, REVERSED IN PART; REMANDED.
NOTES
[1] While Nautilus timely excepted to venue in Orleans Parish, nothing in Louisiana law prohibits a defendant from moving forward with a motion for summary judgment, which can be filed at any time in accordance with La. C.C.P. 966 A(1), prior to a ruling on its timely filed venue exception.
[2] The Montegut case is factually and procedurally distinguishable from the instant case. In Montegut, having affirmed that venue was proper in St. John the Baptist Parish, this court pretermitted any discussion as to whether it was proper to hear defendant's venue exception in priority to plaintiff's motion for summary judgment; however, it was obvious in that case that the plaintiff prematurely filed a motion for summary judgment since the defendant had not yet filed an answer as is required by La. C.C.P. art. 966.
[3] By the filing of a Statement of Facts Which Are Not in Dispute and proceeding with the hearing on its Motion for Summary Judgment, actions that are arguably tantamount to proceeding to a trial on the merits of the case, Nautilus effectively waived its objection to venue in this case.
[4] At no point does MetalPro concede that the steel studs it manufactured and delivered to Stewart for use in the UNO construction project were defective.
[5] Lawyer v. Kountz, 97-2701 (La.App. 4 Cir. 7/29/98), 716 So.2d 493 (action for redhibition based on hidden defects does not constitute "property damage" as contemplated by the terms of the homeowners policy); Harding v. Wang, 98-1865 (La.App. 4 Cir. 2/3/99), 729 So.2d 9 (purchaser's pecuniary damages as a result of the purchase of property with hidden defects was not "property damage" within the meaning of the seller's liability policy).
[6] The Gaylord court held that no coverage existed under a CGL policy for an action against a seller to recover for negligent misrepresentation of a product, in addition to rescission of sale, refund of purchase price, and lost profits incurred due to the failure of the product to perform.
[7] The Gaylord court noted that Propump's concession as to its redhibition claim was consistent with "jurisprudence interpreting similar commercial general liability policies, holding that these unambiguously exclude coverage for damage to the work or product itself or for repair or replacement of the insured's defective work or product." Gaylord, supra at p. 5, 753 So.2d at 353 n. 5.
[8] Under La. C.C.P. art. 852, the pleadings allowed in civil actions include "petitions, exceptions, written motions and answers." See Grimaldi Mechanical, L.L.C. v. The Gray Insurance Company, 05-0695, p. 9 (La.App. 4 Cir. 6/2/06), 933 So.2d 887, 892. Also, La. C.C.P. art. 1154 provides that amendments to the pleadings in order to conform to the evidence are proper.
[9] Grimaldi, supra at p. 20, 933 So.2d at 897-898; Bryant v. Motwani, 96-1351, p. 8 (La. App. 4 Cir. 10/30/96), 683 So.2d 880, 884.
[10] See also Korossy v. Sunrise Homes, Inc., 94-473 (La App. 5 Cir. 3/15/95), 653 So.2d 1215, wherein the owners of homes damaged by excessive differential settlement of foundations sued in redhibition due to faulty construction and defective materials. The insured sought a determination of coverage under its CGL policy. The court determined that the allegations of damage for faulty workmanship was "property damage caused by an occurrence" for purposes of triggering coverage under the CGL's insuring agreement.
[11] In its brief, Nautilus cites the case of Castigliola v. Department of Community Development, 538 So.2d 1139 (La.App. 5 Cir.1989) for support of its position that coverage is precluded by the "contractual liability" exclusion; however, while that case relied on other exclusions to deny coverage under the insured's CGL policy, the "contractual liability" exclusion was not even mentioned.
[12] Each of the cases cited by Nautilus in its original memorandum in support of its summary judgment motion and in its appellee brief involve cases where the recovery sought was for loss of use and/or profits resulting from the insured's failure to either perform a contractual obligation timely or its failure to perform in accordance with the contract specifications. None of the cases relied upon by Nautilus involved loss of use and/or loss of profits arising out of physical damage occasioned to tangible property other than the insured's product. See Williamson v. Alewine, 417 So.2d 64 (La.App. 3 Cir.1982)(coverage precluded for customer's suit against auto garage and its CGL insurer for costs of fixing faulty repairs performed by insured and loss of profits due to delay in repairs); Cute-Togs of New Orleans v. Louisiana Health Serv. & Indemn. Co., 386 So.2d 87 (La.1980)(coverage precluded under CGL policy for loss of profits incurred due to insured's failure to timely perform a contractual obligation); PCS Nitrogen Fertilizer, L.P. v. U.S. Filter/Arrowhead, Inc., 01-2577 (La.App. 1 Cir. 11/8/02), 834 So.2d 456 (no coverage under CGL policy for loss of profits resulting from insured's failure to furnish a water supply system in conformity with contract specifications).
[13] The Nautilus policy's Declarations Page (form S150 (11-97)) indicates MetalPro purchased PCOH protection with a $1,000,000.00 aggregate limit. The Declaration Page refers to form S902 (12-98) for a schedule of forms and endorsement liability applying "to this Coverage Part and made part of this policy." Looking at form S902 (12-98), it is clear that the PCOH exclusion (form CG2104 (11-85)) was not made a part of the Nautilus policy. The Nautilus policy issued to MetalPro, therefore, contains PCOH protection, which provides in pertinent part:

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
(1) Products that are still in your possession; or
(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
(a) When all of the work called for in your contract has been completed.
(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.
b. Does not include "bodily injury" or "property damage" arising out of:
(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;
(2) The existence of tools, uninstalled equipment or abandoned or unused materials;
(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.
[14] The policy defines "your product" as

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
(a) You;
(b) Others trading under your name; or
(c) A person or organization whose business or assets your have acquired; and
(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.
"Your product" further includes "warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and the providing or failure to provide warnings or instructions.
[15] The "your product" and "work product" exclusions are often referred to collectively as the "work product" exclusions. Louisiana Civil Law Treatise: Insurance Law and Practice § 197 (1996). Although the "work" and "product" exclusions are actually two separate exclusions, they are often discussed together since some policy forms incorporate them into a single exclusion (a "work product" exclusion), and they address similar concepts. North American Treatment Systems, Inc. v. Scottsdale Ins. Co., 05-0081, p. 22 (La.App. 1 Cir. 8/23/06), 943 So.2d 429, 444-45. The primary purpose of the "work" exclusion is to preclude liability coverage for an insured's own faulty workmanship, while the "product" exclusion serves the similar purpose of precluding coverage for damage to the insured's own defective product. See Lee R. Russ, et al., 9A Couch on Insurance § 129.19 (3rd ed.2006).
[16] In Supreme Services, the Supreme Court was presented with an alleged conflict between the policy's PCOH provision and its "your work" exclusion, rather than the "your product" exclusion that is at issue in the instant case. However, as previously stated, the "your work" and "your product" exclusions are generally dealt with collectively as the "work product" exclusions, which is how the Supreme Court addressed them in Supreme Services. Consequently, we, too, address the exclusions collectively as the "work product" exclusions.
[17] The PCOH provision, "your product" and "your work" exclusions contained in the CGL policy at issue and interpreted by the Supreme Court in Supreme Services are identical to the applicable provisions found in the Nautilus policy.
[18] Significantly, unlike the allegations made by Stewart in the record of the instant case, the property owner made no allegations, nor presented any evidence, of damages sustained to property except to the work product itself, i.e. the cracked concrete slabs.
[19] Id.
[20] Supreme Services, supra at p. 10, 958 So.2d at 641. See also William Shelby McKenzie and H. Alston Johnson, III, Insurance Law and Practice § 186, pp. 512-521 and § 195, at pp. 554-562 in 15 La. Civil Law Treatise (3rd Ed.2006).
[21] Supreme Services, supra at p. 10, 958 So.2d at 641, citing McMath Constr. Co., Inc. v. Dupuy, 03-1413, p. 7 (La.App. 1 Cir. 11/17/04), 897 So.2d 677, 682.
[22] Supreme Services, supra at p. 10, 958 So.2d at 641.
[23] Supreme Services, supra at p. 11, 958 So.2d at 642. See also Vintage Contracting, L.L.C. v. Dixie Building Material Company, Inc., 03-422 (La.App. 5 Cir. 9/16/03), 858 So.2d 22.
[24] Supreme Services, supra at p. 14, 958 So.2d at 643. This is based on the principle that CGL policies are not intended to serve as performance bonds. McMath, supra at p. 7, 897 So.2d at 682. The jurisprudence has further interpreted the "work product" provisions to exclude consequential damages directly resulting from defective products, such as costs incurred as a result of the delay in a construction project during the repair and replacement process. Id. supra at p. 7, 897 So.2d at 682-83; Gaylord, supra at pp. 8-10, 753 So.2d at 355-56. In McMath, the evidence showed damage solely to the insured's work or product and no physical damage to the contractor's property, thus the PCOH was not triggered to afford coverage. Similarly, in Gaylord, supra, the insured misrepresented the performance of a pump it manufactured. The pump's failure to perform to specification rendered it useless. As in McMath, Gaylord did not allege or show damage to any property other than the lost profits, expenses, fees, and costs incurred due to the pump's failure to perform as represented. While the "work product" exclusions unambiguously precluded coverage for the damages caused in McMath and Gaylord, both courts acknowledged that "damage to property other than the insured's work or product may not be unambiguously excluded under the [PCOH and "work product" provisions]". McMath, supra at p. 7, 897 So.2d at 683; Gaylord, supra at p. 9, 753 So.2d at 355-56.
[25] Supreme Services, supra at p. 14, 958 So.2d at 643.
[26] Supreme Services, supra at p. 15, 958 So.2d at 644 (citing McKenzie and Johnson, fn. 34, p. 521).
[27] The record reveals MetalPro contracted with Stewart to manufacture and supply steel studs to be used for installation of sheetrock in the UNO construction project. After MetalPro completed production of the steel studs and delivered them to the construction site, the studs were used by Stewart to frame and install the sheetrock. Thereafter, Stewart was notified that MetalPro's steel studs were pulling away from the sheetrock on the third and fourth floors of the UNO building causing damage to the sheetrock job.